**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JESSICA BROOKE HALL

                      Plaintiff,

      v.

SCORES HOLDING COMPANY, INC., CLUB
AZURE LLC, HARVEY OSHER, and MARK
YACKOW,

                  Defendants.

Case No.: 21-3387

**COMPLAINT**

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff Jessica Brooke Hall, ("Plaintiff") by and through her attorneys, Danny Grace, P.C., as and for her Complaint in this action against Scores Holding Company, Inc., ("Scores") Club Azure LLC ("Club Azure," the "Company" or the "Club"), Harvey Osher ("Osher"), and Mark Yackow ("Yackow"), (collectively "Defendants") alleges upon personal knowledge and upon information and belief as to the matters as follows:

### NATURE OF THE CLAIMS

    1.    This is an action for declaratory, injunctive, and equitable relief, as well as monetary damages to redress Defendants' unlawful employment practices against Plaintiff, including discriminatory and retaliatory treatment of Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title VII"); the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981a et. seq. ("§ 1981"); The New York State Human Rights Law, New York Executive Law §§ 290 et. seq. ("NYSHRL"); and The New York City Human Rights Law, New York Administrative Code §§ 8-101 et. seq. ("NYCHRL").

2.     Defendants, its owners, managers, and employees intentionally, unlawfully and recklessly treated Plaintiff in a discriminatory manner based on her race in violation of Title VII, § 1981, NYSHRL and NYCHRL.

3.     After Plaintiff complained about such unlawful treatment and asserted her rights under Title VII, § 1981, NYSHRL, and NYCHRL Defendants retaliated and terminated Plaintiff absent any other cause.

4.     Defendants, its owners, managers, and employees intentionally, unlawfully, and recklessly treated Plaintiff in a discriminatory manner solely due to her race in violation of § 1981.

5.     Defendants' conduct was knowing, malicious, willful and wanton and showed a reckless disregard for Plaintiff, which has caused and continues to cause economic and non-economic damages, and severe mental anguish and distress.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq; and the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981a et. seq.

7.     This Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

8.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

9.      Venue is proper in the United States District Court, Southern District of New York, pursuant to 28 U.S.C. §1391, because Defendants are headquartered in this district, and Defendants regularly transact business in the State of New York and the Southern District of New York.

## PROCEDURAL REQUIREMENTS

10.     Prior to the commencement of this action, Plaintiff filed a verified charge to the Equal Employment Opportunity Commission ("EEOC") on or about December 6, 2019, charging Defendants with unlawful discrimination and retaliation in relation to Plaintiff's employment and arising out of the same facts alleged herein.

11.     Plaintiff received a Right to Sue letter from the EEOC on or around January 19, 2021.

12.     This Complaint has been filed within 90 days of Plaintiff's receipt of the Right to Sue letter.

13.     Contemporaneous with the commencement of this action, a copy of this Complaint was served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of §§8-502 of the New York City Administrative Code.

14.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

15.     Plaintiff is a former employee of Defendants.

16.     Plaintiff began her employment with Defendants on October 23, 2009, and remained employed until her unlawful termination on June 26, 2019.

17.     At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

18.     Defendant Scores is a Utah corporation, formed in September 1981, and located in New York, New York.  Defendant Scores is a licensing company that utilizes the "SCORES" name and trademark for licensing options.  Effective September 1, 2017, the Defendant Scores granted an exclusive, non-transferable license for the use of the "Scores New York" to Defendant Club Azure for its gentlemen's club in New York City. Upon information and belief and at all relevant times, Defendant Scores has approximately nineteen clubs operating under the "SCORES" name, including Defendant Club Azure, in New York, New Jersey, Maryland, Illinois, Florida, Louisiana, Georgia, Texas, Indiana, North Carolina, South Carolina, Ohio, Connecticut; and Colorado.

19.     Defendant Club Azure is a gentleman's club registered in the State of New York with headquarters in New York, New York.

20.     During the events described herein and upon information and belief, Defendant Club Azure maintained a headquarters at 603 West 45th Street, 3rd Floor, New York, New York, 10036.

21.     Defendant Harvey Osher, upon information and belief, resides in the State of New York and maintains a place of business in New York, New York within the jurisdiction of this Court.  Upon information and belief, at all relevant times, Defendant Osher is and/or was General Manager for Defendant Club Azure, was in active control and management of the company, and regulated the employment of persons employed by the company, including Plaintiff.  At all relevant times, Defendant Osher met the definition of "employer" under all applicable statutes.

22.     Defendant Mark Yackow, upon information and belief, resides in the State of New York and maintains a place of business in New York, New York within the jurisdiction of this Court.  Upon information and belief, at all relevant times, Defendant Yackow is and/or was the Owner and General Manager for Defendant Club Azure, was in active control and management of

the company, and regulated the employment of persons employed by the company, including Plaintiff.  At all relevant times, Defendant Yackow met the definition of "employer" under all applicable statutes.

23.     At all relevant times, Defendants were Plaintiff's direct employers.

24.     At all relevant times, Defendants met the definition of an "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

25.     Plaintiff began her employment with Defendants on October 23, 2009 initially as a waitress and then eventually as a Massage Person.  At the time of her unlawful termination, Plaintiff was earning an hourly wage of $15.00 per hour and worked an average of thirty-two (32) hours per week.

26.     During her employment, Plaintiff consistently met and exceeded all expectations set of her while performing her duties as a Massage Person.

27.     Although Plaintiff consistently performed all responsibilities required of her and remained committed to Defendants for almost ten years, she was subject to intentional discrimination, retaliation, harassment, and a hostile working environment because of her race and other protected activities throughout her employment with Defendants.

### Violations of Title VII, § 1981, NYSHRL and NYCHRL

28.     Plaintiff is an African-American female.

29.     Plaintiff was subject to intentional discrimination and retaliation solely because of her race.

30.     Defendants continually fostered a working environment preferable to non-African American employees, where non-African American employees were given more money-making opportunities and held to different standards than the African American employees.

31.     Specifically, Plaintiff was intentionally discriminated against, often times very openly, for being the only African American Massage Person working for Defendants, which hired majority non-African American staff, as well as showed obvious favoritism towards their non-African American staff, in particular white staff of Russian National Origin.

32.     Plaintiff was continuously subject to discriminatory policies and supposed 'house rules' that, in actuality, only applied to her.

**Plaintiff's Attire**

33.     For example, in December 2017, Plaintiff was informed by Defendant Osher that "the club was going in a different direction" regarding the massage girl's attire, and that the leotard Plaintiff wore as part of her uniform was no longer allowed or appropriate.

34.     Plaintiff was further told she would need to change her outfit to a more conservative one so as to differentiate the massage girls from the dancers.

35.     At Defendant Osher's direction, Plaintiff changed her uniform and began wearing bodysuits, long gowns, and dresses that better covered her posterior.

36.     However, Plaintiff noticed right away that the other non-African American massage girls did not change their outfits, and in fact continued to wear the same type of leotards that Plaintiff was told she was no longer allowed to wear.

37.     When Plaintiff asked her non-African American co-workers whether they had been notified of the uniform change, she was told that they were never given the instruction from Defendants to change their clothes.

6

38.     Plaintiff's non-African American co-workers were never asked to change their attire, and subsequent massage girls were permitted to wear cheekier style bottoms and more revealing clothing.

39.     Although Plaintiff knew she was being singled out and discriminated against, she continued to abide by Defendants' instructions since the uniform change instruction was an order from the owner himself and she did not think she had any other options.

**House Rules**

40.     Discriminatory treatment continued, and Plaintiff was further subject to discriminatory practices and harassment under the pretext of 'house rules' that, in actuality, only applied to her.

41.     On several occasions, Defendants witnessed Plaintiff being refused assistance or service from other employees while she was entertaining clients.

42.     For example, waitresses would refuse to serve Plaintiff's customers while she entertained them in the Champagne Section (the main floor VIP section), by saying that they were only serving bottles and not individual drinks, which Plaintiff knew to be false.  The waitress only "made an exception" [sic] after the customers started tipping Plaintiff with one-hundred-dollar bills.

43.     Non-African American waitresses and dancers would also openly embarrass and harass Plaintiff in-front of her customers.  For example, on one occasion a waitress screamed "they don't want you" [sic] towards Plaintiff and her potential customers as she was approaching a group.

44.     Frequently, non-African American waitresses and dancers would sit on customers or wrap their arms around customers to purposefully obstruct Plaintiff's ability to do her job, and discourage customers from group VIP private room scenarios with her.

45.     Dancers would also threaten to leave a group of customers if a member in the group agreed to get a massage from Plaintiff.

46.     These types of encounters between Plaintiff and other employees would happen repeatedly, openly, and under Defendants' supervision, many times when Defendant Osher was monitoring the Club.  If Defendant Osher was not on the floor and witnessing these harassments, Plaintiff would  report what was happening to him or another manager.

47.     Although Defendants knew about the discrimination and harassment Plaintiff was experiencing, they did nothing to address it.  On the contrary, they showed obvious favoritism towards the non-African American employees and, essentially, let them do whatever they wanted at Plaintiff's expense.

**VIP Rooms**

48.     Plaintiff was also subjected to discrimination in the enforcement of rules regarding access to VIP private rooms (hereinafter "VIP rooms") in the Club.

49.     Specifically, Plaintiff was not given the same access to VIP rooms as her non-African American co-workers.

50.     Defendants' rule regarding VIP rooms, as Plaintiff knew them, were that (1) any non-dancer employees (waitress/masseuse/bartender) working a VIP room must pay a higher fee for each half hour spent in the room as compared to a dancer employee, and (2) any non-dancer employee entertaining a customer in a VIP room must be accompanied by a dancer *for each individual customer* for the entire duration.

51.     On numerous occasions, Plaintiff and her customer would be turned away from VIP rooms on the basis of rule two (2) stated above.  That included being turned away from VIP rooms

if it was too late in the evening, because the customer only wanted to accompany Plaintiff and not

a dancer employee, and when Plaintiff was in a group of two customers; a dancer, and herself.

52.     The rule would be enforced against Plaintiff even on slow nights to the financial

detriment of the Club and to Plaintiff herself.

53.     Contrarily, Plaintiff witnessed several non-African American waitresses and

massage girls allowed to do hours alone in VIP rooms with customers in violation of the "house

rules" and were never denied access or questioned by Defendants.

54.     Specifically, Plaintiff witnessed a non-African American massage girl gaining

access to a VIP room in a group of two clients, herself, and one dancer; an identical combination

to which Plaintiff was denied.

55.     The only difference between the scenarios is that the times when the rule was

strictly enforced involved African American employees and the times the rule was not enforced

did not.

56.     On numerous occasions Plaintiff would make verbal complaints to Defendant

Osher regarding the unfair enforcement of the house rules, but the discrimination she experienced

was never addressed and only worsened.

**Payment of House Fee**

57.     Defendants further discriminated against Plaintiff by requiring her to pay a house

fee but not requiring her non-African American co-workers to do so.

58.     Defendants purported that the so-called "house fee" was meant to offset the

minimum wage they were now required to pay Massage Persons under New York's wage and hour

laws.

59.     The fee must be paid by the Massage Person for every shift and would "carry forward" if not paid for a shift, including missed shifts.

60.     Plaintiff's fee was one-hundred dollars ($100.00) per shift.

61.     Two exceptions existed to the house-rule; firstly, if the club had a slow night and the Massage Person did not make enough money to cover the fee, and secondly, if the Massage Person only made cash, in which case the fee would be paid when they got the equivalent in Diamond Dollars (club currency).

62.     In the Spring of 2017, Plaintiff was informed by a Club employee that she was the only Massage Person paying the fee.  Specifically, the employee responsible for collecting the fee asked Plaintiff why she kept paying the fee when "none of the other girls were." [sic].

63.     After learning this, Plaintiff asked her non-African American coworkers whether they had been paying the house fee, and they told her that they had never even been told about the house fee.

64.      Following Plaintiff learning that she was the only one paying the house fee, Plaintiff stopped consistently paying the fee.

65.     This did not become a problem until May 12, 2018, when Defendant Osher approached Plaintiff and told her that she was being terminated because he was dissolving her position.  The reason he stated for the termination was that there were not enough Massage Persons working consistently enough to maintain the position.

66.     Plaintiff was shocked, and at the end of the conversation she and Defendant Osher agreed that she could work for a further two weeks before her final day.

67.     However, during one of Plaintiff's shifts within that two-week period, Defendant Osher approached her and said that he would keep the position open for her, but that she must cure the fact that she was not consistently paying the house fee.

68.     Plaintiff, not wanting to get any other employee in trouble, did not mention that she stopped because she was told she was the only person paying it, but instead said that she was not paying it because the club was slow.

69.     Defendant Osher then asked Plaintiff whether she would pay the fee consistently if he lowered her fee from one-hundred dollars ($100.00) to sixty dollars ($60.00) per shift.

70.     Plaintiff agreed to those terms with the understanding that, although worded like a suggestion, the reason she was still employed was because she agreed to pay the fee therefrom.

71.     Plaintiff continued paying the house fee until her unlawful termination on June 26, 2019, even though the non-African American massage persons were not required to pay a fee.

**Complaints and Subsequent Public Reprimanding**

72.     Employees were not allowed to work more than one position during the same shift.

73.     Defendants' rule regarding Club employees, as Plaintiff knew them, were that Waitresses and Bartenders make an hourly wage, earn tips, but do not pay a house fee.  They are charged an extra fee when working VIP rooms to offset their lack of house fee payment.

74.     Furthermore, massage persons make a wage, earn tips, and pay a house fee, as well as are charged an extra fee when working VIP rooms.

75.     Dancers keep all earnings made during their shift, and pay a house fee depending on the time of their work shift.

76.     Dancers and waitresses were not permitted to perform massages on the floor.

77.    Plaintiff made several complaints to Defendants when she witnessed waitresses or dancers giving clients massages, as she was paying a special house fee for the privilege to work that job and they were not.

78.    During one occasion when Plaintiff approached Defendant Osher regarding the fee payment and non-masseuse employees performing her job, he erupted at Plaintiff in anger, publicly shouting at her and embarrassing her in-front of other employees and customers.

79.    On another occasion after witnessing a newly hired dancer giving her client a massage, Plaintiff approached the dancer and explained that massages were provided only by Massage Persons, which is a separate job that requires payment of a house fee.  The dancer responded with hostility, claiming that Plaintiff was being confrontational.

80.    Later that same night, Plaintiff was approached by Defendant Osher who again publicly reprimanded her and embarrassed her in from of other employees and customers. Ironically, he then told Plaintiff to approach him only, if she had any problems.

81.    Notably, Plaintiff's immediate and public discipline stood in stark contrast to the treatment of Defendants' non-African American employees who never received the same time of public reprimanding or adverse action.

82.    This unfair and discriminatory treatment was especially damaging to Plaintiff by nature of her job, wherein so much of her earnings are derived from perceived value and tips.

83.    Every public reprimand and hostile event Plaintiff experienced had a direct and demoralizing effect, blatantly evident to customers, that greatly impacted her ability to make money for herself and the Club.

84.    Based on Defendant Osher's statement, Plaintiff thereafter told him about the discrimination and harassment she experienced while working, including the hostile treatment

from other employees, the unfair enforcement of house rules, house payment, and VIP room access, and highlighted that if this treatment was happening to non-African American employees he would handle it differently.

85.     Plaintiff's conversation with Defendant Osher ended with an agreement that she would go to him with her complaints yet, like the many times before, Defendants never addressed the protected complaints Plaintiff had made.

86.     In actuality, Defendants further perpetuated and allowed the discrimination and harassment she experienced to continue.

**Plaintiff's Suspension and Termination**

87.     The unfair and discriminatory treatment Plaintiff experienced culminated with the circumstances surrounding Plaintiff's ultimate termination.

88.     On the early morning of June 8, 2019, Plaintiff was involved in an after-hours verbal alternation with two fair-skinned Latina waitresses.

89.     At some point during the altercation, Defendant Osher arrived with security, immediately turned to Plaintiff, and yelled at her to get out of the Club.  Security then escorted only Plaintiff out of the club.

90.     Defendant Osher had no objective knowledge of the circumstances relating to the altercation, and Defendant Osher made no attempt to ask what happened or find out.  However, Plaintiff alone was immediately blamed and thrown out.

91.     Afterwards, Plaintiff sent a text message to Defendant Yackow seeking clarification and help, but received no response.

92.     A mere few hours before Plaintiff's next shift, she was notified over text message that she was indefinitely suspended without pay, and was no longer on the schedule.  She was only

permitted to return to the Club to retrieve her personal belongings which were left behind after the altercation.

93.     Plaintiff had witnessed numerous verbal altercations between other employees in the past, including the woman involved in the present altercation, and including instances that contained threats of violence.  The Club owner or security had never been called, and no other employee was ever suspended, as occurred in Plaintiff's case.

94.     Additionally, on one occasion Plaintiff witnessed an employee assault a customer after a verbal exchange.  On another occasion, Plaintiff witnessed two non-African American dancers engage in a physical fight during work hours in front of the main stage.

95.     Neither of these non-African American employees were publicly reprimanded, suspended, nor fired.

96.     Soon after Plaintiff was suspended, she learned that the other non-African American employees involved in the altercation were not suspended along with Plaintiff.

97.     Following Plaintiff's suspension, she continuously attempted to contact Defendants, each time she was either ignored or told to "give it a couple weeks." [sic].

98.     On June 19, 2019, Plaintiff finally met with the Club's Manager.  She was the only manager who kept office hours at the Club and was responsible for processing nightly reports and handling financial matters for the Club.

99.     During their meeting, Plaintiff spoke at length of her various complaints and concerns of discrimination and being treated differently than the non-African American employees at the Club.

100.    Defendants' Manager told Plaintiff, in sum and substance, that she needs to open her eyes to the 'changes' happening at the Club, and that she needs to learn to 'play the game' if she wanted her job back.

101.    Defendants' Manager also told Plaintiff that if she wanted her job back, she needed to go to one of the waitresses involved in the altercation and "take her out" or "buy her a gift" and "apologize, admit all fault" for the argument, so then maybe the waitress would intercede on Plaintiff's behalf and talk to Defendant Osher so to get back on the schedule.

102.    This Manager also admitted to Plaintiff that she was still the only Massage Person paying the house fee, and that Defendant Osher has a preference for white Russian girls and would do anything to protect them, something Plaintiff had heard many times before.

103.    She warned Plaintiff that if she reported anything to Human Resources ("HR"), Defendant Osher would know about it and find a way to embarrass Plaintiff and get her fired 'legitimately,' including alleging that she stole money from the Club—a warning that eventually came true.

104.    On June 26, 2019, Plaintiff contacted Defendants Osher and Yackow via text message, stating that she was now eighteen days into her suspension, still had received no account of what she had done wrong, and did not understand why the matter was being handled the way it was.

105.    Shortly thereafter at around 12:00pm on the same day, Plaintiff made another formal complaint, this time via email, to Defendants' HR department, highlighting the Club's discriminatory policies, the discrimination she experienced, the nature of her suspension, and the overall hostility she experienced at work.  Plaintiff also asked for an opportunity to meet with HR and discuss more of her complaints in person.

106.    Less than an hour after Plaintiff filed her formal complaint with HR, she received a phone call with Defendant Yackow in which he told her she was terminated, effective immediately, offering the pretextual reason that her employment position had been closed.

107.    Plaintiff then spoke to Defendant Osher who again told her she was fired because the Massage Person position closed.

108.    However, Plaintiff confirmed with another employee that *no other Massage Person* had been notified that the position was closed.  In fact, in July of 2019 Defendant hired at least four more girls for the position.

109.    Defendants continuously engaged in discriminatory employment practices, treated Plaintiff differently solely based on her race, and held Plaintiff to different standards than other non-African American employees, in direct violation of Title VII, § 1981, NYSHRL, and NYCHRL.

110.    In response to Plaintiff's complaints, Defendants terminated her employment, which constitutes retaliation under Title VII, NYSHRL, and NYCHRL.

111.    Plaintiff made countless complaints to Defendants regarding the discrimination she experienced, and even filed a formal written complaint with HR.  Instead of investigating the allegations of discrimination, as required by applicable laws, Defendants retaliated against Plaintiff by terminating her employment.

112.    Plaintiff was, and still is, distressed and suffering life altering consequences by the discrimination she suffered solely because of her race.

113.    This Complaint ensues.

### FIRST CAUSE OF ACTION
**(Discrimination in Violation of Title VII – Race/Color)**

114.   Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

115.   Plaintiff, as a person of color, belongs to a protected class within the meaning of Title VII.

116.   Plaintiff was qualified for her position with Defendants based on her professional experience.

117.   Defendants discriminated against Plaintiff on the basis of her race/color by, inter alia, terminating Plaintiff's employment due to her race/color, which constitutes an adverse employment action under Title VII.

118.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

119.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

120.   Defendants' unlawful and discriminatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII – Race/Color)

121.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

122.    Plaintiff participated in a protected activity, namely, reporting the race/color discrimination against her to her superiors and the HR department of Defendants.

123.    Defendants unlawfully retaliated against Plaintiff by terminating her employment, which constitutes as an adverse employment action under Title VII, because of her prior protected activities.

124.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

125.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

126.    Defendants' unlawful and retaliatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Discrimination in Violation of § 1981)**

127.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

128.    Under § 1981, all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts and to the full equal benefit of all laws as is enjoyed by white citizens.

129.    The term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including an employment one.

130.    Plaintiff, as a person of color, is a member of a racial minority within the meaning of § 1981.

131.    Defendants intentionally discriminated against Plaintiff on the basis of her race/color by, inter alia, terminating Plaintiff's employment due to her race/color and due to her complaints of discrimination.

132.    Defendants' intentional discrimination against Plaintiff concerned one or more activities enumerated in the statute, namely, the contractual employment relationship between them.

133.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of § 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

134.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of § 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

135.    Defendants' unlawful and discriminatory conduct in violation of § 1981 was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL – Race/Color)

136.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

137.    Plaintiff, as a person of color, belongs to a protected class within the meaning of NYSHRL.

138.    Plaintiff was qualified for her position with Defendants based on her professional experience.

139.    Defendants discriminated against Plaintiff on the basis of her race/color by, inter alia, terminating Plaintiff's employment due to her race/color, which constitutes as an adverse employment action under NYSHRL.

140.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

141.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

142.    Defendants' unlawful and discriminatory conduct in violation of NYSHRL was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL – Race/Color)**

143.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

144.    Plaintiff participated in a protected activity, namely, reporting the race/color discrimination against her to her superiors and the HR department of Defendants.

145.    Defendants unlawfully retaliated against Plaintiff by terminating her employment, which constitutes as an adverse employment action under NYSHRL, because of her prior protected activities.

146.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

147.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

148.    Defendants' unlawful and retaliatory conduct in violation of NYSHRL was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL – Race/Color)**

149.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

150.    Plaintiff, as a person of color, belongs to a protected class within the meaning of NYCHRL.

151.    Plaintiff was qualified for her position with Defendants based on her professional experience.

152.    Defendants discriminated against Plaintiff on the basis of her race/color by, inter alia, terminating Plaintiff's employment due to her race/color, which constitutes as an adverse employment action under NYCHRL.

153.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

154.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation,

embarrassment, stress and anxiety, loss of esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

155.   Defendants' unlawful and discriminatory conduct in violation of NYCHRL was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL – Race/Color)**

156.   Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

157.   Plaintiff participated in a protected activity, namely, reporting the race/color discrimination against her to her superiors and the HR department of Defendants.

158.   Defendants unlawfully retaliated against Plaintiff by terminating her employment, which constitutes as an adverse employment action under NYCHRL, because of her prior protected activities.

159.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

160.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYCHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

161.    Defendants' unlawful and retaliatory conduct in violation of NYCHRL was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate Title VII, § 1981, NYSHRL, and NYCHRL;

B.    An order directing Defendant to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and/or otherwise unlawful conduct, as well as to take such affirmative action, including reinstatement, as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to the loss of pass and future income, wages, compensation, job security and other benefits of employment;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem self-confidence and personal dignity, emotional pain and suffering and any other physical or mental injuries;

E.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

F.     An award of punitive damages, pursuant to Title VII, § 1981, NYSHRL, and NYCHRL in an amount to be determined at trial;

G.     An award of damages for any and all other monetary and/or non-monetary damages losses suffered by Plaintiff an amount to be determined at trial, plus prejudgment interest;

H.     An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by laws; and

I.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all issues so triable.


Dated:  April 17, 2021
      New York, New York                           Respectfully submitted,

                                        DANNY GRACE, P.C.
                                        *ATTORNEYS FOR PLAINTIFF*

                                        222 BROADWAY, 19TH FLOOR
                                        NEW YORK, NY 10038
                                        (646) 515-2821

                                        _____/S/_____
                                        DANIEL GRACE, ESQ.